FILED

Dec 9  3 19 PM '03

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ENRICO DiPASQUALE d/b/a<br>WESTPORT CHEMICAL COMPANY<br><br>                  Plaintiff<br><br>V.<br><br>GEORGIA GULF CORPORATION<br><br>                  Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)CIVIL ACTION NO.303CV0013 PCD<br>)<br>)<br>)NOVEMBER 10, 2003 |

**AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Shawna E. Avila, being first duly sworn, deposes and says:

1. I am employed by Georgia Gulf Corporation as a paralegal in the Georgia Gulf Legal Department.

2. I have custody and control of documents pertaining to the above-referenced civil action.

3. Since 1991, the contract attached to my affidavit as Exhibit A was the only agreement entered into between the plaintiff Enrico DiPasquale d/b/a Westport Chemical Company and the defendant Georgia Gulf Corporation until the time of the commencement of this action.

4. The contract attached to my affidavit as Exhibit A is the "Agreement" referred to in paragraph 6 of the complaint in this action.

5. The plaintiff, for his complaint, alleges a breach of the Agreement by wrongfully terminating it causing him damages and a violation of Connecticut's Unfair Trade Practices Act.

6. All of the plaintiff's causes of action arise out of the defendant's alleged wrongful termination of the Agreement.

7. The time of termination of plaintiff's contract rights is evidenced by plaintiff's letters of June 15, 2001 and June 29, 2001, copies of which are attached hereto as Exhibits B and C respectively.

8. The Agreement (Exhibit A) specifically provides, in paragraph 11, as follows: "No action arising out of this contract shall be commenced later than one year after cause of action has accrued."

9. This action was commenced by filing the complaint with the court in accordance with Rule 3, F.R.C.P. on January 21, 2003, more than one year after the cause of action accrued.

10. The instant action is untimely as the time for the commencement of the plaintiff's complaint has been limited by contract to one year from the time "the cause of action has accrued".

Further deponent sayeth not.

_____
SHAWNA E. AVILA

STATE OF GEORGIA        )
COUNTY OF  Cobb         )   ss: Atlanta         November  12  , 2003

Personally appeared, SHAWNA E. AVILA, who, having been duly sworn, made oath to the truth of the foregoing statement.



_____
Notary Public        (Seal)
My Commission Expires:

My Commission Expires 12-6-2006

## CERTIFICATE OF SERVICE

I certify that on November 13, 2003 a copy of the foregoing was served upon the plaintiff by mailing a copy to its attorney of record by first class mail, postage prepaid, at the following address:

William Meehan, Esq.
Slutsky, McMorris & Meehan, LLP
396 Danbury Road, Second Floor
Wilton, CT 06897

Benson A. Snaider

# CONTRACT

## GEORGIA GULF CORPORATION

DATE: December 30, 1991

GEORGIA GULF CORPORATION, Seller, hereby sells and agrees to deliver to WESTPORT CHEMICAL COMPANY, Buyer, and Buyer hereby purchases and agrees to receive from Seller the following product in the quantities and upon the terms and conditions hereinafter stated:

**PRODUCT & QUALITY:**

Liquid Caustic Soda, 50% solution (diaphragm grade), 76% $Na_2O$ basis, per attached Product Information Bulletin.

**QUANTITY:** Minimum quantity to be supplied by Seller estimated at 225 short dry tons per year and maximum quantity not to exceed, except at Seller's option upon request by Buyer, 250 short dry tons per year.

**TERM:** During the period from January 1, 1992 to December 31, 1992, inclusive, and continuing from year to year thereafter, subject to termination by Buyer or Seller at the end of any contract year upon at least ninety (90) days prior written notice and in accordance with other terms and conditions specified herein.

**PRICE:** Subject to revisions as hereinafter provided.

$315 per short dry ton, less 5% resale allowance, for a net price of $299.25 per short dry ton.

**PLACES OF DELIVERY & MEANS OF SHIPMENT:**

F.O.B. Seller's Terminal, Perth Amboy, NJ, customer pick-up.

THE GENERAL TERMS APPEARING ON THE REVERSE SIDE HEREOF FORM A PART OF THIS CONTRACT.

WESTPORT CHEMICAL COMPANY                      GEORGIA GULF CORPORATION
Buyer                                          Seller

By _[signature]_                               By _[signature]_

Title: _[signature]_                           Title: _National Sales Mgr_

                                               Sept 18, 1992

EXHIBIT A

# Georgia Gulf

## Specifications

# 50% Liquid Caustic Soda
## (Sodium Hydroxide)
### NaOH

| Property | | Limit | Test Method |
|---|---|---|---|
| Sodium Hydroxide | (NaOH), wt. % | 49.00-51.00 | ASTM E-291 |
| Sodium Oxide | ($Na_2O$), wt. % | 38.00-39.50 | ASTM E-291 |
| Sodium Carbonate | ($Na_2CO_3$), wt. % | 0.20 maximum | ASTM E-291 |
| Sodium Chloride | (NaCl), wt. % | 1.10 maximum | ASTM E-291 |
| Sodium Chlorate | ($NaClO_3$), wt. % | 0.35 maximum | ASTM D-2022 |
| Sodium Sulfate | ($Na_2SO_4$), wt. % | 0.02 maximum | ASTM E-291 |
| Iron | (Fe), wt. % | 0.0007 maximum | ASTM E-291 |

Read and Accepted By: *Enrico DiPasquale*, owner

Title: *D/B/A Westport Chemical Company*

Date: *Sept 04, 1992*

*PDM 9/15/92*

### International Sales Offices

2900 North Loop West
Suite 1200
Houston, TX 77092, U.S.A.
Telephone: (713) 956-3905
FAX: (713) 956-0109
Telex: 910-881-7221

400 Perimeter Center Terrace
Suite 595
Atlanta, GA 30346, U.S.A.
Telephone: (404) 395-4577
FAX: (404) 395-4529
Telex: 810-751-0027

### Domestic Sales Offices

*Midwest*
Two Crossroads of Commerce
Suite 202
Rolling Meadows, IL 60008
Telephone: (708) 577-8400
FAX: (708) 577-8473
Telex: 910-227-0047

*Southeast*
400 Perimeter Center Terrace
Suite 595
Atlanta, GA 30346
Telephone: (404) 395-4589
FAX: (404) 671-8260
Telex: 810-751-0027

*Northeast*
133 Franklin Corner Road
Lawrenceville, NJ 08648
Telephone: (609) 895-1177
FAX: (609) 895-0135

*Southwest*
2900 North Loop West
Suite 1200
Houston, TX 77092
Telephone: (713) 956-3920
FAX: (713) 956-3909
Telex: 910-881-7221

PSCA/1 Rev. 7/91-1M

# GENERAL TERMS

1. **CHANGES IN PRICE:** The prices stated in this Contract may be changed by Seller on the first day of any month occurring within the contract period by giving to Buyer notice in writing of such change at least fifteen (15) days before the effective date thereof. If, before the effective date of any such change, Buyer notifies Seller in writing that Buyer is unwilling to accept the change, and Seller, notwithstanding such notice from Buyer, elects not to rescind or modify such change in a manner acceptable to Buyer, then Buyer may terminate this Contract with respect to the product or products as to which the price was changed, as of or after the effective date of the change, by written notice to Seller of Buyer's election so to terminate, which notice shall specify the date of termination, but the changed price shall continue in effect until the date specified in such termination notice. Buyer's failure to make written objection to any such change prior to the effective date shall be deemed an acceptance thereof.

2. **GOVERNMENT RESTRICTION ON PRICES:** Seller shall have the right to terminate this Contract upon fifteen (15) days notice to Buyer in the event Seller desires to revise the price or prices pursuant to paragraph 1, but is restricted to any extent against so doing by reason of any law, decree, order or regulation of Government or in the event the price or prices currently effective hereunder are deemed to be in excess of those allowed under any law, decree, order or regulation of Government.

3. **INCREASED OR NEW TAXES:** Any tax or Governmental charge or increase in same hereafter becoming effective which increases the cost to Seller of producing, selling or delivering the product or of procuring materials used therein, or any tax now in effect or increase in same payable by Seller because of the sale of the product, such as, but not limited to, Sales Tax, Use Tax, Retailer's Occupation Tax, Gross Receipts Tax, may, at Seller's option, be added to the price herein. Nothing herein shall be construed to permit Seller to effect an increase of the price herein specified by reason of the imposition or increase in any corporate net income tax by any federal, state or local taxing entity or authority.

4. **OFFER TO BUYER BY ANOTHER SELLER:** Should Buyer at any time be offered a lower delivered price on material of equal quality, in a quantity equal to or greater than the quantity remaining to be shipped hereunder, for the same use by a responsible manufacturer having a production facility for the product located in the United States and furnish to Seller satisfactory proof of the same. Seller will either supply such quantity at the lower price or permit Buyer to purchase such quantity elsewhere and terminate this contract.

5. **WEIGHT MEASUREMENT OF BULK SHIPMENTS:** In the case of bulk shipments, Seller's weight shall govern unless established to be inaccurate.

6. **MONTHLY SHIPMENTS:** Shipments will be by the means indicated on the face hereof in full capacity carloads, truckloads or barges as the case may be in approximately equal monthly quantities over the contract term. The maximum quantity which Seller shall be obligated to deliver in any month shall be a proportionate part of the maximum quantity to be supplied by Seller under this Contract, determined by dividing such maximum quantity by the number of months in the contract term. If such proportionate part of said maximum quantity is not taken by Buyer in any month, the undelivered part may, at the option of Seller, be cancelled or be added at Buyer's request to subsequent deliveries. There shall be no obligation on Seller to tender to Buyer delivery of any quantity as to which Buyer has not given Seller shipping instructions.

7. **FORCE MAJEURE:** In the event war; insurrection; riot; fire; flood or other unusual weather condition; explosion; act of God; peril of the sea; strike, lockout or other industrial disturbance; sabotage; accident; embargo; breakage of machinery or apparatus; injunction; act of governmental authority; compliance with governmental order or national defense requirements; inability to obtain fuel, power, raw materials, labor, containers or transportation facilities or any other circumstance beyond the reasonable control of the parties interferes with the production, shipment or consumption of product covered by this Contract or with the supply of any raw material used in connection therewith, the affected party may upon reasonable and prompt notice to the other, suspend deliveries for the period during which such conditions prevail.

If because of any such circumstances, Seller is unable to supply the total demand upon it for the product, Seller may allocate its available supply among all of its customers and itself in an equitable manner.

At the option of either party, the total quantity to be delivered hereunder shall be reduced by the quantity for which deliveries were suspended under this paragraph.

8. **TERMS OF PAYMENT:** Net cash within thirty (30) days from date of shipment. All amounts payable hereunder shall be paid in lawful money of the U.S. and in cash, or in negotiable paper collectible at its face value at Seller's location to which payment is to be made as directed in Seller's Invoice.

9. **TITLE AND RISK OF LOSS:** Title and risk of loss in all product sold hereunder shall pass to Buyer upon Seller's delivery to carrier at shipping point. Seller warrants that it will convey good title and deliver product to the carrier at shipping point free from all lawful security interests, liens or encumbrances unknown to Buyer.

10. **WARRANTIES; LIMITATIONS:** Seller expressly warrants that the product sold will be of the quality described on the face hereof and will meet Seller's standard specifications or the specifications, if any, attached hereto. Unless otherwise agreed in writing, SELLER MAKES NO FURTHER WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, RELATING TO THE PRODUCT, WHETHER USED ALONE OR IN COMBINATION WITH OTHER SUBSTANCES. SPECIFICALLY EXCLUDED ARE THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AND THE IMPLIED WARRANTY OF MERCHANTABILITY.

11. **LIMITATION OF LIABILITY; REMEDIES:** Rejection of nonconforming product must be made by Buyer in writing within seven (7) days after receipt of product and all defects ascertainable at time of giving of notice shall be alleged with particularity or be deemed waived. Buyer's failure to give notice of any claim within said seven (7) days shall constitute an unqualified acceptance of the product and a waiver by Buyer of all claims with respect thereto. All rejected product shall be held for inspection. Demurrage shall be for Buyer's account if product does not conform. If product does not conform, it shall be held by Buyer pending instructions for disposal from Seller (at Seller's expense). In the event of nonconformity of product, Buyer's exclusive remedy shall be rejection of product and, at Seller's election, (1) credit for the purchase price, including any transportation charges paid by Buyer or (b) Seller's repair or replacement of product.

No action of Buyer arising out of this Contract shall be commenced later than one year after the cause of action has accrued. No consequential or incidental damages shall be allowed either in the event of nonconformity or nondelivery of product. Seller shall not be liable for, and Buyer assumes responsibility for, all personal injury and property damage resulting from the handling, possession, resale or use of the product by Buyer in Buyer's manufacturing processes, whether used alone or in combination with other substances.

Seller may recover for each shipment hereunder as a separate transaction, without reference to any other shipment. Should Buyer be in default with respect to any of the terms or conditions under this or any other Contract with Seller, Seller, may, at its option and without prejudice to any other legal or equitable remedy, either terminate this Contract or suspend any further deliveries hereunder until correction of the default.

If, in Seller's judgment, Buyer's credit shall become impaired at any time, Seller shall forthwith have the right to suspend deliveries hereunder except for cash until such time as Buyer's credit has been re-established to Seller's satisfaction.

In the event of suspension of deliveries due to Buyer's default or credit impairment, the contract term may, at Seller's election, be extended by a time equal to that during which deliveries are suspended.

Either party's waiver of any breach, or failure to enforce any of the terms and conditions of this Contract, at any time, shall not in any way affect, limit or waive either party's right thereafter to enforce and compel strict compliance with every term and condition hereof.

12. **GOVERNMENTAL LAW AND REGULATIONS:** Seller's and Buyer's obligations hereunder shall be subject to all applicable governmental laws, rules, regulations, executive orders, priorities, ordinances and restrictions now or hereafter in force, including, but not limited to, (a) the Fair Labor Standards Act of 1938, as amended; (b) Title VII of the Civil Rights Act of 1964, as amended; (c) The Age Discrimination in Employment Act of 1967; and (d) the rules, regulations and executive orders pertaining thereto.

Seller agrees that (a) the Equal Opportunity Clause of Executive Order 11246 of September 24, 1965, as amended; (b) the Certification of Nonsegregated Facilities required by said Order; and (c) the contract clause entitled "Listing of Job Openings" pertaining to the employment of qualified disabled veterans and veterans of the Vietnam era (published in 41 CFR 50-250.2) shall be incorporated herein by reference.

13. **ENTIRE AGREEMENT:** This Contract constitutes the entire agreement between the parties hereto, and there are no understandings, representations or warranties of any kind, express or implied, not expressly set forth herein.

14. **ASSIGNABILITY:** Neither party may assign this Contract or its rights under this Contract without specific written consent to the assignment by the other party, provided that either party may assign to its own corporate affiliate if said affiliate accepts in writing all of the provisions of this Contract and agrees to become in all respects bound thereby in the place and stead of the assigning party.

15. **ACCEPTANCES REQUIRED:** This writing is a proposal only and to constitute a binding commitment of Seller must, after execution by Buyer, be executed on behalf of Seller in the space provided on the face hereof and returned to Buyer; provided further, that if executed on behalf of Seller upon delivery to Buyer, this writing is an offer to sell which will expire if not executed on behalf of Buyer and returned to Seller prior to January 31, 1992.

# WESTPORT CHEMICAL CO.
P.O. Box 21
Wilton, Connecticut 06897
Telephone: (203) 849-3232
Facsimile: (203) 847-2442

June 15, 2001

BY EXPRESS MAIL

Mr. Edward A. Schmitt
President and Chief Executive Officer
Georgia Gulf Corporation
400 Perimeter Center Terrace
Suite 595
Atlanta, Georgia 30346

Re:  <u>Westport Chemical Co./Georgia Gulf Corporation</u>

Dear Mr. Schmitt:

I am writing with respect to an unacceptable situation that has developed in recent months concerning the relationship between our companies. Westport Chemical Co. has been an authorized distributor and reseller of Georgia Gulf products since its establishment in or around 1984. Prior to that time, Westport Chemical enjoyed a similar relationship with Georgia Pacific. Throughout its relationship with Georgia Gulf, Westport Chemical has served Georgia Gulf and the consumers of Georgia Gulf's products in a competent, professional manner to the mutual financial benefit of Georgia Gulf and Westport Chemical. Consequently, I was puzzled when I recently was advised by Mr. Bruce Smith that Georgia Gulf had decided to refuse to honor any further orders from Westport Chemical, and was terminating the companies' long relationship.

I believe that Georgia Gulf's actions are improper, and a violation of Westport Chemical's longstanding agreements with Georgia Gulf. I have been unable to make any progress in resolving this situation with other Georgia Gulf representatives. Accordingly, I request your assistance in resolving this dispute, and restoring Westport Chemical to its proper place as an authorized distributor and reseller of Georgia Gulf's products.

Please note that Georgia Gulf has commenced collection proceedings against Westport Chemical in connection with the last few orders that were filled by Georgia Gulf. I also request that you instruct the appropriate personnel to discontinue such efforts while we negotiate an amicable resolution of the outstanding issues.

Please call me at your earliest convenience to discuss this matter further.

Thank you for your anticipated cooperation. I look forward to hearing from you soon.

Very truly yours,

Enrico DiPasquale

**EXHIBIT B**

**WESTPORT CHEMICAL CO.**
P.O. Box 21
Wilton, Connecticut 06897
Telephone: (203) 849-3232
Facsimile: (203) 847-2442

June 29, 2001

Mr. Bruce A. Smith
Account Manager
Georgia Gulf Corporation
The Atrium at Lawrence
133 Franklin Corner Road
Lawrenceville, New Jersey 08648

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Re: <u>Westport Chemical Co./Georgia Gulf Corporation</u>

Dear Bruce:

I am writing with respect to your June 20, 2001, letter to me concerning the relationship between Westport Chemical and Georgia Gulf. The proposal outlined in your letter does not satisfactorily address the issues that have arisen as a result of Georgia gulf's improper termination of Westport Chemical as an authorized distributer and reseller.

First, as you know, Westport Chemical has consistently ordered — and Georgia Gulf has consistently shipped — tonnage of caustic soda well in excess of the amount set forth in the parties' agreement. At a minimum, Georgia Gulf's restriction on the tonnage that Westport Chemical may order must be eliminated.

Second, Georgia Gulf's improper termination of our relationship has damaged my business. As you know, in order to operate a chemical products supply business successfully, a distributer needs to be assured of both the source and price of the product it intends to distribute. Westport Chemical has not enjoyed either of those advantages since it was terminated by Georgia Gulf. Westport Chemical deserves to be compensated for the problems it has encountered as a result of Georgia Gulf's improper action. In addition, rebuilding my business will take some time. To enable me to do so, Georgia Gulf must extend the term of the parties' agreement through at least December 31, 2002.

Third, Westport Chemical must be assured of competitive pricing. Accordingly, please forward to me all current price lists and bulletins, together with any price lists or bulletins applicable to the period during which Westport Chemical was prohibited from ordering.

Fourth, your letter does not address Westport Chemical's standing as an authorized distributer and reseller of Georgia Gulf products other than caustic soda. Please advise as to how Georgia Gulf wishes to proceed in this regard.

EXHIBIT C

Finally, as noted in my June 15 letter, Georgia Gulf has commenced collection proceedings against Westport Chemical. The continuation of such efforts by a third party collection agency is not conducive to our efforts to negotiate an amicable resolution of the issues between our companies. As requested in my previous letter, please instruct the appropriate personnel to discontinue such efforts during the pendency of our discussions.

Please call me at your earliest convenience to discuss this matter further.

Thank you for your anticipated cooperation. I look forward to hearing from you soon.

Very truly yours,

*Enrico DiPasquale*

Enrico DiPasquale

2